**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TAMMY SUE CHAPLIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv1384 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying Tammy Sue

Chaplin's application for supplemental security income benefits ("SSI") under Title XVI of

the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the Court, see 28 U.S.C.

§ 636(c), for a final disposition. Ms. Chaplin has filed a brief and reply brief in support of

her complaint; the Commissioner has filed a brief and surreply brief in support of his answer.

## Procedural History

Tammy Sue Chaplin (Plaintiff) applied for SSI in April 2007, alleging a disability as

of April 1, 2004, caused by high blood pressure, bipolar disorder, compulsive self-mutilation,

chronic headaches, asthma, and depression. (R.[1] at 86-92.) Her application was denied

initially and after a hearing held in March 2009 before Administrative Law Judge (ALJ)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his
answer.

Victor L. Horton. (<u>Id.</u> at 6-36, 38-55.) Subsequently, the Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzales, a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was married and had five children, although she had custody of only two. (<u>Id.</u> at 10.) She is 5 feet 2 inches tall, weighs approximately 215 pounds, and is right-handed. (<u>Id.</u> at 13.) She graduated from high school. (<u>Id.</u>) She, her husband, her mother, and the two children live in an apartment, and have been for three years. (<u>Id.</u> at 11.) She lost custody of her other three children to her sister when the house they were living in was condemned. (<u>Id.</u>) The household income is her mother's disability. (<u>Id.</u> at 12.) They also get food stamps and Medicaid. (<u>Id.</u> at 13.)

Her husband usually does the laundry at a laundromat. (<u>Id.</u> at 12.) The baby's clothes are washed by hand. (<u>Id.</u>)

Plaintiff testified that she last worked in approximately 1994. (<u>Id.</u> at 14.) She was then working part-time doing housekeeping for a hotel. (<u>Id.</u> at 15.) She had also worked as a busperson and dishwasher. (<u>Id.</u> at 16.) Twice a month she goes to the grocery store three blocks away. (<u>Id.</u> at 22.) Her husband goes with her. (<u>Id.</u>) She also goes to the Walgreen's, which is near the grocery store, to pick up prescriptions. (<u>Id.</u> at 23.) Asked if she still vacuums for her mother, she replied that she had broken the vacuum cleaner. (<u>Id.</u>)

- 2 -

Plaintiff explained that she can not work because of bipolar disorder. (<u>Id.</u> at 17.) She first saw a psychiatrist when she was hospitalized in approximately 2005. (<u>Id.</u> at 17, 23.) She has been on medication since then. (<u>Id.</u> at 17.) The medication, Paxil, was prescribed by her primary care physician; she could not remember his name. (<u>Id.</u> at 18.) She was hospitalized again in February 2006. (<u>Id.</u> at 23.) Asked about May 2006, she did not remember being hospitalized then. (<u>Id.</u>)

Also, she is depressed because her sister will not bring her children to visit and she cannot go there because they do not have a car. (<u>Id.</u>) And, she compulsively self-mutilates, has high blood pressure, and gets headaches. (<u>Id.</u> at 19, 21.) Her asthma is under control. (<u>Id.</u> at 20.) The left valve in her heart does not completely close, but she is not currently taking any medication for that. (<u>Id.</u>) Her headaches occur daily and last for weeks. (<u>Id.</u> at 21.) She takes Tylenol, but her doctor wants her to see a neurologist. (<u>Id.</u>)

Asked about a reference in the records to Plaintiff quitting her last job when she found out she was pregnant, Plaintiff explained that she had done so because of the cleaning chemicals she was around. (<u>Id.</u>) She has not tried to seek employment since then because she was taking care of the children until 2005. (<u>Id.</u>)

Plaintiff tries to fight thoughts of suicide by holding her young children. (<u>Id.</u> at 24.) She has daily crying spells, some lasting an hour or two. (<u>Id.</u>) She unconsciously scratches herself when she sleeps. (<u>Id.</u> at 25.)

Plaintiff smokes one or two cigarettes a week.  (Id. at 25-26.)  She does not drink, and has not since being hospitalized in 2005.  (Id. at 26.)  She used marijuana only once, and that was the day her children were taken away.  (Id.)  She does not have a driver's license.  (Id.)

Ms. Gonzales then testified as a VE.  She classified Plaintiff's housekeeping job as light, unskilled work.  (Id. at 28.)  She replied affirmatively to the following question.

> [A]ssume a hypothetical individual with the claimant's education, training, and work experience . . . .  Further, assume the individual can perform light work with the following limitations:  This individual must avoid concentrated exposure to extreme cold, fumes, odors, dust, and gas.  This individual can understand, remember, and carry out at least simple instructions, nondetailed tasks, demonstrate adequate judgment to make simple work-related decisions; can perform work at a normal pace without production quotas.  Are there jobs that that individual could do?

(Id. at 28-29.)  Specifically, Plaintiff can not perform her past job as a housekeeper because of the exposure to chemicals but can work as an usher, a ticket taker, and a school bus monitor.  (Id. at 29-30.)  These jobs were light, unskilled work that existed in significant numbers in the state and national economies.  (Id.)

The next hypothetical added an ability to maintain concentration and attention for two-hour segments over an eight-hour period and to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent, but deleted an ability to perform at a normal pace without production quotas.  (Id. at 31.) Such a hypothetical person could not perform the jobs earlier cited, but could work as an assembler, electrode cleaner, or stock checker.  (Id. at 31-32.)  These jobs also existed in significant numbers in the state and national economies.  (Id. at 32.)

If this second hypothetical individual also was absent from work three times a month due to mental issues, there were no jobs that she could perform. (Id.) If the individual had the limitations described by Plaintiff's treating psychiatrist in his October 2007 report, there were no jobs such an individual could perform. (Id. at 34.)

The VE affirmed that her testimony was consistent with the Dictionary of Occupational Titles (DOT).

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, school records, records from various health care providers, and assessments by non-examining and examining health care providers.

When applying for SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 3 inches and her weight as 222 pounds. (Id. at 112-20.) Her impairments first bothered her in early 1999 and stopped her from working on April 1, 2004. (Id. at 113.) She then reported that she had stopped working on March 31, 1995, when she was pregnant with her daughter and could no longer work around chemicals. (Id.)

Plaintiff also completed a Function Report. (Id. at 128-35.) Asked to describe what she did from waking to sleeping, Plaintiff listed various tasks related to her medical needs, e.g., checking her urine and weight and taking pills, and sedentary activities, e.g., watching television. (Id. at 128.) Her husband cooks his own meals, takes care of the cat, and helps with the laundry. (Id. at 129, 130.) She only sleeps for a couple of hours. (Id. at 129.) She

goes outside daily.  (Id. at 131.)  She does not have a driver's license.  (Id.)  She shops for

groceries twice a month for one to one and one-half hours.  (Id.)  She used to enjoy reading,

doing puzzles, crocheting, and taking care of flowers, but has lost interest in these activities.

(Id. at 132.)  Her impairments adversely affect her abilities to lift, squat, bend, stand, walk,

kneel, climb stairs, remember, complete tasks, concentrate, and follow instructions.  (Id. at

133.)  She can walk for only five minutes before having to stop and rest for five minutes.

(Id.)  She does not handle stress well; rather, she cries and scratches herself.  (Id. at 134.)

She wears glasses and braces on her hands.  (Id.)

    Another Function Report was completed on Plaintiff 's behalf by her mother.  (Id. at

136-43.)  Asked to describe what Plaintiff did during the day, her mother replied that

Plaintiff watched television, played board games, and crocheted.  (Id. at 136.)  Plaintiff helps

her with cleaning and cooking; Plaintiff's husband helps Plaintiff with the laundry.  (Id. at

137.)  He also changes the cat litter because Plaintiff is pregnant.  (Id.)  Before her

impairments, Plaintiff was able to do everything she was asked; now, someone has to go with

her when she goes someplace.  (Id.)  Plaintiff's mother reminds her to take her medication.

(Id. at 138.)  Plaintiff has lost interest in cooking, but does it anyway because she is

pregnant.  (Id.)  She is able to do some household chores, including cleaning, laundry, and

caring for plants.[2]  (Id.)  Her hobbies include watching television, playing cards, reading, and

crocheting.  (Id. at 140.)  She does these hobbies all the time.  (Id.)  In addition to the

abilities Plaintiff described as being adversely affected by her impairment, her mother added

---

[2]Plaintiff testified at the hearing that all the plants have died.

sitting, using her hands, reaching, and seeing. (Id. at 141.) Plaintiff cannot walk farther than one mile without having to stop and rest for fifteen minutes and has to read something two or three times to understand it. (Id.) Because of her impairments, Plaintiff is more moody and easily angered. (Id.)

After the initial denial of her application, Plaintiff completed a Disability Report – Appeal form. (Id. at 146-53.) Since applying, she has more crying spells, is more depressed and hopeless, and does not want to do anything. (Id. at 146.) She can not concentrate for longer than five minutes and can not remember anything for long. (Id.) Her current medications included Procardia for high blood pressure, Prozac for the compulsive self-mutilation, and Topamax for her bipolar disorder. (Id. at 149.) The first causes dizziness; the second drowsiness; and the third drowsiness and dizziness. (Id.) It takes her an hour to brush her hair. (Id. at 150.) Also since applying for disability, she has had a baby boy. (Id. at 151.)

Plaintiff's earnings report lists annual income in 1987, 1988, 1990, 1991, 1992, 1994, and 1995. (Id. at 93.) Her highest earnings were $4,697.09, in 1991. (Id.) In the remaining six years in which she had reportable earnings, they exceeded $3,000 in only one year. (Id.) In two years, they were less than $1,000. (Id.) One Work History Report listed two jobs: one as a dishwasher and busperson from 1987 to 1988 and one as a housekeeper in a hotel from August 1990 to February 1995. (Id. at 104-11.) Another also listed two jobs, but both were as housekeepers. (Id. at 125.) One was from June 1990 to July 1992 and the other was from 1994 to March 1995. (Id. at 125-27.)

Pursuant to Plaintiff's appeal from the denial of her application for Medical Assistance benefits, the Family Support Division of the Missouri Department of Social Services found that Plaintiff was permanently and totally disabled by severe major affective disorder for at least one year.  (Id. at 99-103.)

Plaintiff's records from School District of the City of St. Charles, Missouri, include a sixth grade evaluation in November 1984 concluding that her "weaknesses in auditory discrimination and word attack skills" were not affecting her tested achievement, but her lack of motivation to complete her work and her frequent absences combined with not making up the work did affect it.  (Id. at 167-72.)

The medical records before the ALJ begin in May 2004, a month after Plaintiff's alleged onset date.  They are summarized below in chronological order, with the exception of the checklist-format records of Dr. Rodriguez.  Dr. Rodriguez's records are discussed following the chronological summary.

On May 14, 2004, Plaintiff had an electrocardiogram (ECG) in an emergency room.  (Id. at 353.)  It revealed a normal sinus rhythm of 78, but was otherwise normal.  (Id.)

Plaintiff's blood tests in August showed a high cholesterol level.  (Id. at 351-52.)

On January 2, 2005, Plaintiff went to the emergency room at St. Joseph Health Center[3] (St. Joseph).  (Id. at 343, 348-49.)  X-rays of her chest were within normal limits.

---

[3]The emergency room records of St. Joseph generally consist of one page listing personal information and a brief statement of the reason for the visit and of preprinted discharge forms.

(Id. at 348-49.)  She returned to the St. Joseph emergency room in March for treatment of joint pain in her upper arm.  (Id. at 455.)

Plaintiff was admitted to St. Joseph on June 30 for suicidal ideation and discharged on July 3.  (Id. at 417-28, 554-64.)  On admission, she was extremely tearful, reporting that the custody of her children had been given to her sister because of her poor living conditions. (Id. at 419.)  She had had no prior psychiatric hospitalizations, but had been on medication. (Id.)  While hospitalized, she was treated with medication and received individual and group counseling, anger management counseling, and behavior modification counseling.  (Id. at 418.)  When discharged, she denied having any suicidal or homicidal ideation.  (Id.)  She and her husband would not answer any questions about their past.  (Id. at 422.)  She was alert and oriented to time, place, and person and had a sequential flow of thought.  (Id.)  On discharge, she was diagnosed with depression and an anxiety disorder and assessed a GAF of 50.[4]  (Id. at 418.)  She was to follow-up with a Dr. Mandava.  (Id.)

Plaintiff returned to the St. Joseph emergency room on September 28 for anxiety.  (Id. at 550-53.)  An ECG showed a heart rate that was slightly increased compared to the May 2004 ECG, but was otherwise normal.  (Id. at 341.)

---

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV], the Global Assessment of Functioning [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

Plaintiff went to the St. Joseph emergency room on October 31 for joint pain in her forearm and again on December 5. (Id. at 435-37.) The reason for the latter visit is simply reported as "injury site." (Id. at 435.)

Plaintiff returned to the emergency room on January 11, 2006, after dropping a bucket on her right foot. (Id. at 248-56.) There was no fracture. (Id. at 256.)

Plaintiff was hospitalized at St. Joseph from February 7 to February 10 after having suicidal thoughts. (Id. at 180-91, 565-71, 573, 576-79.) She had lost her insurance the previous July and had stopped taking her medication, including her medication for asthma, hypertension, and hyperlipidemia. (Id. at 182, 184, 191.) She had been evicted, and her landlord had thrown out her belongings. (Id. at 182.) Her sister had temporary custody of her three children; her husband was unemployed and living with friends. (Id.) On admission, her affect was tearful, her mood was low, her flow of thought was logical, her concentration was fair, her intellect was average, and her insight and judgment were fair. (Id.) Her GAF was 30.[5] (Id.) She was treated with antidepressant medication, individual and group counseling, anger management counseling, and behavior modification counseling. (Id. at 181.) A spirometry was normal. (Id. at 188-90.) On discharge, she was diagnosed with depression with anxiety and was prescribed Lexapro. (Id. at 181.) Her GAF was 50. (Id.) She was to follow up with the Crider Center. (Id. at 187.)

---

[5] A GAF score between 21 and 30 is indicative of behavior that "is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." DSM-IV at 34.

Plaintiff went to the emergency room on April 18 for treatment of a right thumb sprain. (Id. at 236-47, 340, 538.) She returned the next month, on May 4, after having suicidal ideation since February, but no active plans. (Id. at 228-35, 572, 574.) She had run out of her medication, Lexapro. (Id. at 234.) She denied any current suicidal ideation and did not want to be hospitalized. (Id.) Her mother agreed to assume responsibility for her. (Id.)

An emergency room record dated June 7 lists the reason for the visit as "injury site." (Id. at 453.) Two days later, Plaintiff returned for treatment of a headache. (Id. at 450-52.) Two weeks later, she sought treatment at the emergency room for right ankle pain. (Id. at 217-27.) X-rays showed no evidence of fracture or dislocation. (Id. at 225, 339.) There was, however, a slight deformity in the distal PIP (proximal interphalangeal) joint in the fourth toe, which could possibly represent degenerative changes or possible postoperative changes. (Id. at 225.)

Plaintiff went to the emergency room twice in July for treatment of an injury to her left lower leg. (Id. at 430-34.) "Injury site," not otherwise specified, was given as the reason for an August visit. (Id. at 447.) Anxiety was the reason for a September visit. (Id. at 441-44.) Two days after this visit, Plaintiff returned with complaints of left ankle pain after a motorized wheelchair ran over her foot. (Id. at 205-16.) X-rays showed no fracture or dislocation. (Id. at 215.)

Plaintiff sought treatment at the Crider Center on October 11. She was taking Seroquel and reported an initial feeling of sedation when the dosage was increased to 200

milligrams.  (Id. at 263.)  She felt she was on a more even keel.  (Id.)  She was receiving Housing Assistance and was looking for an apartment with her husband.  (Id.)  She was casually dressed in clean clothes and had good hygiene.  (Id.)  She was cooperative and had a pleasant mood.  (Id.)  She had no anxiety.  (Id.)

The following month, Plaintiff reported to the health care provider at the Crider Center that she was doing okay.  (Id. at 264.)  She was working on getting a security deposit together for her new apartment.  (Id.)  One week later, a treatment plan was discussed and was continued in effect.  (Id. at 262.)  The next month, Plaintiff reported that she might be pregnant.  (Id. at 261.)  Her mood was euthymic; her affect was okay.  (Id.)  The following week, the pregnancy was confirmed[6] and treatment without psychotropic medication was discussed.  (Id. at 260.)

Plaintiff returned to the St. Joseph emergency room on January 11, 2007, for dental problems and was referred to the dental clinic.  (Id. at 195-202.)

The next month, the Crider Center notes reflect that Plaintiff continued to remain off psychotropic medication because of her pregnancy.  (Id. at 259.)

A venous duplex examination of her left lower extremity on March 22 showed no evidence of deep venous thrombosis or greater saphenous vein thrombosis in the left leg.  (Id. at 193-94.)

---

[6]Records relating to her pregnancy are noted only to the extent they are relevant to her medical problems at issue.  (See id. at 382-84, 386-416.)

Srinivas Battula, M.D., did a psychiatric evaluation of Plaintiff on April 18. (Id. at 284-85.) She was 28 weeks pregnant. (Id. at 284.) She was not then taking any psychotropic medication, but had decreased sleeping and appetite. (Id.) She had been taking Seroquel, which was helpful, until she became pregnant. (Id.) She had never attempted suicide. (Id.) She was applying for disability. (Id.) Her mood was anxious; her affect was depressed and anxious. (Id.) She was fully oriented and had fair insight and judgment. (Id.) Her memory was intact and her speech was normal. (Id.)

When Plaintiff saw Dr. Battula on June 6, she was tearful and anxious. (Id. at 467.) "Crider [was] trying to have her kids to be [sic] given to her sister (permanently)." (Id.) She and her husband had been staying with her mother. (Id.) She was scratching herself more due to the stress. (Id.) She instructed Dr. Battula not to release any information to Crider. (Id.) She was prescribed 20 milligrams of Prozac. (Id.)

Eleven days later, Plaintiff had a baby. (Id. at 466.)

Her dosage of Prozac was doubled when she saw Dr. Battula on July 6. (Id.) It was noted that Crider had decided that her children would remain in her sister's custody. (Id.) She was tearful and depressed, but was oriented to time, place, and person. (Id.) Dr. Battula wondered whether to add a mood stabilizer, Topamax, to her medications. (Id.)

Topamax was added at Plaintiff's August 3 visit. (Id. at 465.) She was still scratching herself and unable to talk with her children over the telephone because her sister would not let her. (Id.) She was described as depressed and anxious; her content of thought and cognition were appropriate. (Id.) Her GAF remained at 50. (Id.)

At Plaintiff's next visit, in October, she reported that her sister would not let her talk to her daughter on her daughter's birthday. (Id. at 464, 495.) Anafranil, an antidepressant, was added to the Prozac and Topamax. (Id.) In November, the medication dosages remained as before. (Id. at 494.) Also unchanged were her crying spells and her sister's refusal to let her contact her children. (Id.)

Because of side effects, i.e., headaches, the Topamax was discontinued at Plaintiff's next, December visit to Dr. Battula. (Id. at 493.) Lithium was prescribed instead. (Id.) Plaintiff had spoken with her children for fifteen minutes over the telephone. (Id.) She was depressed and anxious. (Id.)

When Plaintiff next saw Dr. Battula, on January 18, 2008, she reported that she had seen her children for two hours on Christmas. (Id. at 492.) Her motivation was less; her depression was greater; her scratching had increased. (Id.) Her dosages of the three medications were also increased. (Id.) The Anafranil and Lithium were stopped at the next visit, in February, because Plaintiff was again pregnant. (Id. at 491.) The dosage of Prozac was reduced. (Id.) Her GAF had increased to 55.[7] (Id.) On March 12, Plaintiff complained of getting less sleep and feeling more stressed. (Id. at 490.)

The next day, she went to the emergency room at St. Joseph with complaints of chest pain. (Id. at 478-83.) An ECG was normal. (Id. at 481-82.)

---

[7]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

When Plaintiff saw Dr. Battula in April and again in May her GAF remained at 55. (Id. at 488-89.) Each time she was described as depressed and anxious. (Id.) Plaintiff's scratching had increased in July; her GAF had not. (Id. at 487.)

Plaintiff was seen at the St. Joseph emergency room on September 13 for hypertension. (Id. at 469-73.)

In October, two weeks after Plaintiff delivered a baby boy, Dr. Battula assessed Plaintiff's GAF as 50 and restarted her on the former medications. (Id. at 486.) Plaintiff's scratching had increased. (Id.)

She returned to the emergency room in November for treatment of an infection. (Id. at 474-77.)

The next month, Plaintiff informed Dr. Battula that she was angry with her primary care physician. (Id. at 485.) She was depressed; she missed her children. (Id.) Her dosages of Prozac and Anafranil were increased; the dosage of Lithium remained as before. (Id.)

Unless otherwise noted, the records of Drs. Rodriguez and Paul Hinton, M.D., generally consist of notations on a form titled "Office Progress Notes." The form provides a line to list allergies and describe chief complaints. There is also a line labeled "Subjective." Space is provided for the listing of blood pressure, height, and weight. The majority of the form consists of symptoms or diagnoses listed under headings. For instance, under the heading "PSYCH" are listed anxiety, appetite, depression, euphoria, insomnia, aggression, and hallucinations. Under "CONSTITUTIONAL" are listed fever, weight

loss/gain, fatigue, night sweats, and "chg." mental status. Mindful of this format, the Court reviews Drs. Rodriguez's and Hinton's notes.

Those begin on April 19, 2004, when Plaintiff consulted Dr. Rodriguez about migraine headaches. (Id. at 333-34.) Insomnia was the only psychiatric condition circled. (Id. at 333.) Plaintiff saw Dr. Rodriguez the next month for a runny nose and her migraine headaches. (Id. at 331-32.) Depression was the only psychiatric condition circled. (Id. at 331.) In June, she went to him for a rash on her left arm and diarrhea. (Id. at 329-30.) Her diagnoses included asthma, hypertension, gastroesophageal reflux disease (GERD), and migraine headaches. (Id. at 330.) Fatigue was listed as a diagnosis and depression was circled in October. (Id. at 325-26.) Her complaints were of a cough and sore throat. (Id.) The following month, fatigue was again listed; however, depression was not circled. (Id. at 323-24.) When Plaintiff saw Dr. Rodriguez in December, her complaints were of back and abdominal pain, a head cold, and swollen jaw. (Id. at 321-22.) Depression or any other psychiatric condition was not circled or listed, nor did any such condition appear again in his notes until April 2005.

Plaintiff consulted Dr. Rodriguez on January 4, 2005, about a cough, diarrhea, and vomiting. (Id. at 319-20.) His diagnosis was an upper respiratory infection. (Id.) Two months later, she saw him about right thumb pain. (Id. at 317-18.) The following month, in April, Plaintiff saw him for a rash once and for a runny nose and headaches one week later. (Id. at 313-16.) At the earlier visit, anxiety was listed as a diagnosis. (Id. at 315.)

Plaintiff returned to Dr. Rodriguez twice in May also. (Id. at 309-12.) The first visit was for an injury to her right thumb and migraines; the second was for a skin rash. (Id.) He noted at this visit that she was depressed because her house had been condemned and she was homeless. (Id. at 309.)

Plaintiff reported to Dr. Rodriguez on June 14 that she had gone to the emergency room after falling and passing out. (Id. at 307-08.) She did not want to be hospitalized for depression, which he characterized as severe. (Id. at 308.) Two weeks later, Plaintiff was still depressed. (Id. at 305-06.) The following month, however, her complaints were of abdominal pain. (Id. at 303-04.)

In March 2006, Plaintiff consulted Dr. Rodriguez about her asthma, migraine headaches, depression. (Id. at 301-02, 521-22.)

Plaintiff returned to Dr. Rodriguez in August for a check-up and refill of her prescriptions. (Id. at 299-300, 337-38, 519-20, 535-36.) Anxiety and depression were circled; a notation by the word "depression" reads "bipolar." (Id. at 299.)

In September, she saw him for headaches, anxiety and insomnia. (Id. at 297-98.) In October, it was for a check-up and painful left foot and knee. (Id. at 296, 515.) In November, an upper abdominal ultrasound of Plaintiff was performed at Dr. Rodriguez's request. (Id. at 336, 514, 534.) The results indicated an "[e]chogenic appearing liver, probably due to fatty infiltration and common bile duct," but were otherwise normal. (Id.) When Plaintiff saw Dr. Rodriguez in December for a pregnancy check-up, the diagnoses included asthma and bipolar disorder. (Id. at 293, 512.)

Plaintiff saw Dr. Rodriguez on January 2, 2007, for a follow-up visit for her respiratory infection. (Id. at 292, 511.) Anxiety was marked as being present. (Id.) An ECG performed that same day indicated a "[p]reserved left ventricular systolic function" and "[m]ild mitral regurgitation." (Id. at 532-33.) On January 30, both anxiety and depression were present when she saw him for earaches and a cough. (Id. at 291, 510.) Anxiety was marked in his notes for her February, March, April, May, June, July, and August visits. (Id. at 287-89, 503-09.)

In September, Plaintiff saw Dr. Hinton for complaints of wheezing, coughing, headaches, and knee pain caused by a fall. (Id. at 502.) There were no psychological symptoms marked. (Id.) Plaintiff complained of headaches again at her next three visits, one in November, one in December, and one in January 2008. (Id. at 499-501, 525.) In February, she complained of a cough and fever. (Id. at 498, 523-24.) Her next, March visit was described as routine. (Id. at 497.) In April, Plaintiff's left side of her face was swollen due to a cold sore on her lip. (Id. at 543.) Her May and July visits were described as routine. (Id. at 541-42.) In October, she consulted Dr. Hinton about her blood pressure. (Id. at 539.) The form for a December visit lists headaches as her complaint. (Id. at 528.) A psychological symptom is not circled or marked on any of the forms completed by Dr. Hinton.

The ALJ also had before him an evaluation by a non-examining consultant and another assessment by an agency official.

In July 2007, Michael Stacy, Ph.D., completed a Psychiatric Review Technique Form, finding that Plaintiff had an affective disorder, i.e., a history of bipolar and major depressive disorder, and an anxiety-related disorder, i.e., an obsessive compulsive disorder. (<u>Id.</u> at 354-65.) These disorders caused mild restrictions in her daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (<u>Id.</u> at 362.) They did not, however, cause any repeated episodes of decompression or any extended duration. (<u>Id.</u>) In reaching his conclusions, Dr. Stacy noted Plaintiff's history of inpatient and outpatient psychiatric services and the records of Dr. Battula. (<u>Id.</u> at 364.)

Dr. Stacy also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in seven of the twenty activities listed[8] and not significantly limited in the remaining thirteen activities. (<u>Id.</u> at 366-68.) He further found that Plaintiff retained the ability to understand and carry out simple instructions, to carry out simple work instruction, to maintain adequate attendance and sustain an ordinary routine without special supervision, and to adapt to minor changes in a work setting. (<u>Id.</u> at 368.)

The same day, an agent completed a Physical Residual Functional Capacity Assessment of Plaintiff, listing the primary diagnosis as asthma, the secondary diagnosis as

---

[8]These seven are her abilities (1) to understand and remember detailed instructions, (2) to carry out detailed instructions, (3) to maintain attention and concentration for extended periods, (4) to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (5) to accept instructions and respond appropriately to criticism from supervisors, (6) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (7) to set realistic goals or make plans independently of others. (<u>Id.</u> at 366-67.)

hypertension, and obesity as "other impairments." (Id. at 369-73.) With these impairments, Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations. (Id. at 370-72.) She did have two environmental limitations, i.e., she needed to avoid even moderate exposure to extreme cold and fumes. (Id. at 372.)

Dr. Battula also assessed Plaintiff's mental residual functional capacity.[9] (Id. at 461-63.) His impression was of obsessive compulsive disorder and bipolar disorder. (Id. at 461.) He assessed Plaintiff's GAF as 50, see note 4, supra, and described Plaintiff as manifesting depression, anger, fear, resentment, a lack of emotion, appetite disturbance, pervasive loss of interest, feelings of guilty or worthlessness, irritability, persistent anxiety, emotional mood manifestations, obsessions, poor memory recall, an inability to perform simple calculations, psychomotor agitation or retardation, and pathological passivity and dependence. (Id.) Plaintiff's psychiatric condition exacerbated her experience of pain or other physical symptoms. (Id.) Of twenty-five work-related mental activities and aptitudes listed, Plaintiff was assessed as having none or poor abilities in all but seven and as having fair abilities in those seven. (Id. at 462.) She had no restriction in her activities of daily living, marked difficulties in social functioning, and repeated episodes of deterioration or decompensation in work or work-like settings. (Id. at 463.) She often had deficiencies in concentration, persistence, or pace. (Id.)

---

[9]His assessment is undated, but, giving Plaintiff the "benefit of the doubt," the ALJ considered it completed the same date as the cover letter, October 12, 2007.

At the request of her counsel, Plaintiff was evaluated in February 2009 by David A. Lipsitz, Ph.D. (Id. at 545-49.) Plaintiff reported that she had been diagnosed with bipolar disorder both at St. Joseph and by Dr. Battula. (Id. at 545.) She had both manic and depressive moods, but primarily depressive. (Id. at 546.) Her energy and interest levels were diminished. (Id.) She had some suicidal thoughts, but did not act on them because of her two babies. (Id.) She also had recurrent panic attacks. (Id.) She was seeing a psychiatrist, Dr. Battula, on a regular basis, but was not seeing a therapist or counselor. (Id.) After administering Plaintiff IQ tests[10] and summarizing her social history, Dr. Lipsitz assessed her as follows.

> [Plaintiff] is an obese short 36-year old white married female who appears in some acute distress. She is oriented to time, place, and person; there is no evidence of any active psychotic functioning, no delusions, hallucinations, paranoid ideation, ideas of reference, or feelings of depersonalization. Her affect is flat; her mood is depressed with recurrent suicidal ideations but no actual plans or intent to harm herself. Her intellectual functioning appears to be within the "low average" range. Her thought processes are primarily preoccupied with her fears, her insecurity, her mood disturbance, and her inability to function within society.

(Id. at 547-48.) He diagnosed Plaintiff with bipolar disorder and obsessive compulsive disorder. (Id. at 548.) Her GAF was 45.[11] (Id.)

**The ALJ's Decision**

---

[10]Plaintiff had a verbal IQ score of 79 on the Wechsler Adult Intelligence Scale – III, a performance IQ of 86, and a full scale IQ of 80.

[11]See note 4, supra.

Analyzing Plaintiff's application pursuant to the Commissioner's five-step sequential evaluation process, see pages 24 to 27, the ALJ found at step one that Plaintiff had not been engaged in substantial gainful activity at any relevant time. (Id. at 43.) At step two, he determined that she had severe impairments of obsessive compulsive disorder, asthma, obesity, and hypertension. (Id.) At step three, he found that her impairments, singly or in combination, did not meet or equal an impairment of listing-level severity. (Id.) Consequently, he addressed the question of her residual functional capacity (RFC), finding that she had the RFC to occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand/walk for six hours in an eight-hour workday; sit for the same length of time; understand, remember, and carry out simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple work related decisions; and respond appropriately to supervisors and co-workers in a task-oriented setting with infrequent and casual contact with others. (Id.) Plaintiff should avoid concentrated exposure to cold, fumes, odors, dust, and gases. (Id.)

When assessing Plaintiff's RFC, the ALJ considered Plaintiff's testimony, but found that, based on the evidence of record, her medically determinable impairments could reasonably be expected to produce some of her alleged symptoms, but not of the intensity, duration, and limiting effects described by Plaintiff. (Id. at 44.) For instance, medical tests such as x-rays, the venous duplex examination, and the ECG revealed no significant abnormalities. (Id. at 45-46.) Dr. Battula's RFC findings, although supportive of Plaintiff's

claims, were not determinative because they were conclusory, relied on her reports of her limitations and symptoms, were inconsistent with other evidence, including references in his records to her pleasant and cooperative attitude, clear and organized thought processes, and fair and good judgment, and did not establish that the limitations lasted for an continuous period of twelve months.  (Id. at 45-47.)

In addition to the lack of supporting medical evidence, also detracting from Plaintiff's credibility was her "relatively limited history of medical treatment," lack of any recent psychiatric hospitalizations, and lack of intensive psychiatric treatment that would be expected for an individual totally disabled by a mental impairment.  (Id. at 48.)  Plaintiff's daily activities were limited, but the limitations could not be objectively verified or attributable to her medical condition.  (Id.)  Her work history and her unpersuasive appearance and demeanor at the hearing also detracted from her credibility.  (Id. at 48-49.) Specifically, Plaintiff did not display any evidence of severe pain or discomfort and had no apparent difficulty understanding or responding to questions.  (Id. at 49.)  She was tearful when speaking about her inability to care for her children.  (Id.)

At step four, the ALJ determined that Plaintiff had no past relevant work and no transferable work skills.  (Id.)  Given her age, education, and RFC, he concluded at step five that Plaintiff could perform the jobs of assembler, electrode checker, and stock checker.  (Id. at 49-50.)  She was not disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national

economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See also</u> 20 C.F.R. § 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)). <u>Accord</u> **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). <u>Cf.</u> **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting

Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he (a) failed to properly assess her mental RFC by not following the regulations and not referring to her multiple hospitalizations, (b) failed to give adequate weight to the opinion of Dr. Battula, relying instead on the opinion of a non-examining

consultant,[12] and (c) failed to contact Dr. Battula if he thought the record was unclear or insufficient.[13]  The Commissioner disagrees.

As discussed above, Plaintiff has the burden at step four of establishing her RFC.  **See** **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004).  On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional."  **Id.** at 738.

In the instant case, the ALJ determined that Plaintiff had the RFC to understand, remember, and carry out simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple work related decisions; and respond appropriately to supervisors and co-workers in a task-oriented setting with infrequent and casual contact with others.[14] (Id.)

As Plaintiff notes, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  S.S.R. 96-8p, 1996 WL 374184, * 7 (Soc. Sec. Admin. July 2, 1996). In the instant case, the ALJ summarized in detail the medical and nonmedical evidence,

---

[12]Plaintiff also argues that the consultant was not a medical expert.  The record indicates that Michael Stacy has a Ph.D.

[13]In a reply brief, Plaintiff requests that the Court consider a decision finding her disabled as of July 2009 as evidence that the decision at issue is wrong.  As noted by the Commissioner, however, the question before the Court is whether she was disabled during the period from April 2004 through March 11, 2009.

[14]It is the ALJ's findings as to her mental RFC that Plaintiff is challenging; thus, the ALJ's findings as to her physical RFC are not at issue.

including Plaintiff's medical records.  Although the ALJ did not present his RFC findings in bullet points with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p.  Rather, the concern of Ruling 96-8p is "that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting Ruling 96-8p).  The ALJ did not overlook any of Plaintiff's limitations.[15]

Also, the Court notes that an integral part of the ALJ's determination of a claimant's RFC is an evaluation of her credibility.  See **Wagner**, 499 F.3d at 851, **Dukes**, 436 F.3d at 928.  Although Plaintiff is not challenging the ALJ's assessment of her credibility, "the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."  **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010).

Plaintiff further argues that the ALJ erred by not giving the proper weight to the opinion of her treating psychiatrist, Dr. Battula.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord

---

[15]Plaintiff also argues that the ALJ erred by not following Social Security Ruling 85-15 when assessing her RFC.  That Ruling clarifies how to define the erosion of an occupational base when there are mental impairments.  The ALJ included in his hypothetical question to the VE the mental limitations he found supported by the record.

**Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009); **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001). See also **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (noting that a treating physician's opinion does not automatically control the outcome because the record must be evaluated as a whole). Title 20 C.F.R. § 416.927(d) delineates six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 416.927(d)(1)-(6). "The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating physician when that opinion was primarily based on claimant's subjective complaints rather than on objective medical evidence); **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

The opinion by Dr. Battula that Plaintiff argues should have been given controlling weight was written in October 2007. He first treated Plaintiff in April of that year, when she was pregnant and unable to take psychotropic medication, including Seroquel, which she

reported was helpful. He next treated her in June; she was still pregnant. When he saw her in July, she had given birth and was able to take medication again. He saw her one more time before October. At these two sessions, her concerns were with her sister gaining permanent custody of her three older children and denying her access to them. She had overcome the loss of housing, had reunited with her husband, and had had two babies. Although her affect and mood were depressed, her flow of thought, memory, and appearance were appropriate and she was oriented to time, place, and person. She had no suicidal ideation.[16] Thus, before assessing Plaintiff's mental RFC, Dr. Battula had seen her twice when she was not on medication and twice when she was dealing with custody of and access to her children. Moreover, his office notes, recorded in a checklist format, contradicted some of his assessments. See **Randolph v. Barnhart**, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ properly refused to give treating physician's opinion controlling weight when that opinion was in form of checklist and was given after physician had met with claimant only three times). For instance, he stated she had poor memory recall, but always marked that her memory was intact or appropriate. He assessed her as having a lack of emotion, but never marked her affect as blunted.

---

[16]Plaintiff argues that Plaintiff's two hospitalizations for suicidal ideation support Dr. Battula's conclusions and her claim of disabling depression. They do not. The first was for four days in 2005 and followed her sister having been given custody of Plaintiff's children due to Plaintiff's living conditions. On discharge, she was to follow up with a doctor; she did not. Indeed, she did not seek any mental health treatment until being hospitalized for three days eight months later after stopping to make her medication and being evicted. She was to follow up with the Crider Center, but did not for the next six months. Her sporadic seeking of mental health treatment during this period supports the ALJ's finding that her mental impairment did not meet the durational requirement.

For the foregoing reasons, the ALJ did not err in not giving greater weight to Dr. Battula's mental RFC assessment of Plaintiff.  See **Heino v. Astrue**, 578 F.3d 873, 880 (8th Cir. 2009) ("Although a treating physician's opinion is generally entitled to substantial weight, that opinion does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion.).

Plaintiff further argues that the ALJ erred by not contacting Dr. Battula if the record was unclear or insufficient, correctly noting that the ALJ had a duty to do so in such a case. "'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)).  "The ALJ does not[, however,] 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Id.** (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  The ALJ found no crucial issue was undeveloped.  That finding is supported by substantial evidence on the record as a whole.

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. Consequently, regardless of whether the Court would have decided differently, the ALJ's decision must be affirmed. See **Wildman**, 596 F.3d at 964; **Davidson v. Astrue**, 578 F.3d 838, 841-42 (8th Cir. 2009). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of September, 2010.